# APPEAL OF N. M. McDOWELL.

123 381
36 SC ²516

[N. M. McDOWELL v. A. A. HUTCHINSON.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS NO. 1
OF ALLEGHENY COUNTY, IN EQUITY.

Argued November 1, 1888—Decided January 7, 1889.

(a) McDowell made a contract with a bridge company to build their bridge according to specifications, in consideration of $650,000, payable part in corporate bonds and part in common and preferred stock. Hutchinson then made a contract with McD. to advance money or loan his credit to the amount of $270,000, to enable McD. to complete the bridge.

(b) In the latter contract, McD. guaranteed that the cost of the bridge should not exceed $290,000, and the right to receive the securities was transferred to H., who was to be repaid his advances with interest, and to have as his own one half of the securities after the cost of the erection of the bridge was paid.

(c) By proceedings at law the height of the bridge was increased to accommodate navigation, thereby necessitating a change in the specifications: H. furnished but part of the money, and ceased compliance with his contract, whereby McD., to perform his contract with the bridge Co., was compelled to negotiate bridge bonds and stock at a loss of $30,000 upon their value.

(d) McD. and H. failing to effect a settlement, H. brought an action at law against the bridge Co. for the delivery of the securities undelivered to him, and subsequently McD. filed a bill against H. and the bridge Co. to stay the suit at law, to have his contract with H. canceled as of the date when the latter ceased performance, and for an account, etc.

1. In such case, the increased cost of the bridge arising from the operation of the decree of court increasing its height, was to be added to the $290,000, the limit of cost under the contract.

2. McD., who kept his contract under a vital breach of it by H., but failed to rescind thereon with promptness, could not have the contract canceled as of the date of H.'s failure to perform, but must stand upon the contract and recover damages for its breach.

3. H.'s covenant, whether dependent or independent, was kept in part and broken in part, and the measure of the damages for its breach was the loss occasioned to the enterprise by his default, of which loss, McD. who kept his covenants should bear no part.

4. The securities under the transfer to H. were held only as collateral, and as H.'s failure to perform his covenant had entailed the loss referred to upon the enterprise, and McD. had performed H.'s duty, H. must pay to McD. the whole of the loss, to wit $30,000.

5. As the disposition of the case left no equities or legal claims on the part of H. against the bridge Co., the proceedings at law were inconsistent with the proceedings in equity, and on final decree were restrained.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, WILLIAMS and HAND, JJ.; CLARK, J., absent.

No. 89 October Term 1888, Sup. Ct.; court below, No. 122 December Term 1886, C. P. No. 1 in Equity.

On September 28, 1886, Nathan M. McDowell filed a bill in equity against A. A. Hutchinson and the North Side Bridge Company, in which the averments were in substance as follows:

That A. A. Hutchinson had brought suit against the North Side Bridge Company at No. 406 March Term 1886, C. P. No. 1, for $114,650 as the par value of 2293 shares of preferred stock of the company, assigned to him by said ·N. M. McDowell, but which the said company refused to deliver.

That about March 12, 1883, said McDowell, the plaintiff herein contracted with said bridge company to construct its bridge over the Allegheny river for $250,000 of corporate bonds, $200,000 of preferred stock, and $200,000 of common stock, the plaintiff to pay damages to property occasioned by the construction of said bridge, which was to be completed ready for public travel within twelve months from the date of the contract, but the time for completion was subsequently extended to another period of twelve months.

That to relieve himself from care, trouble, etc., the plaintiff negotiated with A. A. Hutchinson, the defendant herein, to provide the money necessary to meet the monthly estimates and build the bridge, and on October 11, 1883, entered into a contract with the defendant which was as follows:

This agreement, made this 11th day of October, A. D. 1883, between A. A. Hutchinson, of Allegheny City, Pennsylvania, party of first part, and Nathan M. McDowell, of same city, party of the second part:

WHEREAS, Said party of second part, has taken the contract for building a bridge from Seventh street, city of Pittsburgh, to Sandusky street in the city of Allegheny, for the North Side Bridge Company, a corporation duly chartered, which contract bears date the 12th day of March, 1883; and

Statement of Facts.

WHEREAS, Said party of first part has agreed, and by these presents doth agree, to furnish the money or credit necessary to enable the second party to carry out his said contract to completion.

Now THIS AGREEMENT, WITNESSETH : Said party of the first part hereby agrees to advance from time to time whatever money is needed to carry on the work of construction of said bridge, or loan his credit to party of second part to enable him to obtain the necessary . funds, commencing on or before the first day of November, 1883, and not exceeding the sum of $12,000 in cash before the first day of April, 1884, and in a total sum not to exceed the amount of $270,000 for the entire completed bridge, franchises, land and other damages, and purchase of real estate.

And it is agreed that all plans, specifications and contracts shall be submitted to said party of first part, before same shall be approved or let, and shall be subject to his approval or rejection ; and that no legal steps be taken to condemn property or adjust any differences except through the attorneys for both parties hereto, or their selections ;

And in consideration therefor, said party of the second part before any of the money or credit hereinbefore mentioned shall be advanced, agrees to transfer to said party of the first part, his entire right to receive from said bridge company $250,000 of said company's thirty year six per cent. bonds, secured by mortgage on property and franchises ; $200,000 of said company's preferred stock ; $200,000 of the common stock of said company, and also what other stock or consideration said party of second part may receive in addition to those above named.

And it is further agreed, that all money realized from sale of bonds and stock shall be first paid to party of first part until he shall have received back whatever money and interest on same, which he may have from time to time advanced or obtained.

And it is further agreed that whatever stock or bonds, or the proceeds thereof shall be left over and above the cost of the said bridge, including the property, land damages and franchises, shall be divided equally between said parties hereto, and said party of second part hereby guarantees that the total cost of the bridge, franchises, property, damages, and all, shall not exceed the sum of $290,000 : and in case of the said cost exceeding said sum of $290,000, such excess of cost shall be paid by him, and no portion thereof shall come off said party of first part, or his share of bonds and stock, or proceeds thereof.

And it is finally agreed that none of the bonds shall be sold at less than ninety per centum without the consent of party of second

part, unless it shall appear that such price cannot be obtained, and in such an event they shall be sold under direction of some reputable banker for whatever price he can obtain for them.

That at the time said contract was executed, the plaintiff assigned to the defendant all his right, title and interest in the bonds and stock, to be issued to him in accordance with his contract for building said bridge, and directed the bridge company to issue said bonds and stock to said defendant, and that this assignment was agreed to and approved by resolution of the board of directors of the bridge company. That said assignment to the defendant was intended as collateral security to him for his advancements, which were to be made, as was distinctly understood, at his trouble and cost and in time to meet the monthly estimates, and were to be reimbursed to him out of sales of the bonds to be made after the completion of the bridge, and then the division of the surplus was to be made equally between them.

That little work was done upon the bridge until the spring of 1884; and up to August 1, 1884, the defendant had advanced only about $80,000, when he went to California where he remained four months, throwing upon plaintiff the care and expense of procuring money to complete the bridge. That defendant did not, during his absence nor afterwards, perform any part of the consideration of the contract, but on the contrary on July 28, 1884, was intrusted with $75,000 of said bonds to be discounted for cost and expenses of the bridge, and in violation of good faith and his duty, under said contract, appropriated the proceeds to his own benefit, and never accounted for any part thereof.

That after the defendant's departure for California the plaintiff arranged with Robinson Brothers to dispose of sufficient of the bonds and preferred stock to meet the expense of the bridge, which, by reason of the standing of that firm and an arrangement whereby that firm should pay out the proceeds upon the estimates of construction, was done, but at a loss, said bonds and stock then selling necessarily at a lower price than when the bridge was completed.

That there was an implied understanding from said conduct of the defendant that the contract between the plaintiff and the defendant was at an end; although, after the defendant's

return from California, the plaintiff, without any recognition of defendant's right and without consideration, but in the hope that no trouble would arise between them, voluntarily gave defendant 1050 shares ($52,500) of the preferred stock and 2000 shares of common stock.

That subsequently the defendant demanded additional preferred stock, and, although the plaintiff sought to have an accounting with him, yet the defendant, desiring to vex and annoy the plaintiff and harass the bridge company, had brought the suit hereinbefore referred to, which suit was vexatious and unnecessary, as the rights of the plaintiff and defendant could only be adjusted by a suit in equity for an accounting between them, after ascertaining whether the defendant had any right to the undelivered stock, or any right to retain any or all he then held, and what were the profits of the contract.

That the delivery of the bonds and stock by the bridge company to the plaintiff was known to the defendant and unobjected to by him, and to that extent the provisions of the assignment to the defendant were abrogated by and with the defendant's consent.

The prayers of the bill were:

1. That the contract between plaintiff and defendant be declared rescinded as of August 1, 1884.

2. That the defendant be decreed to return so much of the stock received by him as is just and equitable, and account for the bonds received, or their proceeds.

3. That the defendant be decreed to account and refund to the plaintiff the expenses incurred by reason of his default in performing his duties under their agreement, up to August 1, 1884.

4. That the bridge company be restrained from assigning, transferring or delivering any common or preferred stock remaining in its hands, to said defendant.

5. That the defendant be enjoined from maintaining the suit to No. 406 March Term 1886.

6. And for such other and further relief, etc.

On November 10, 1886, the North Side Bridge Company answered, substantially admitting the averments of the bill, and concurring in the fourth and fifth prayers thereof.

Statement of Facts.

On the same day, the defendant Hutchinson, demurred upon the grounds, in substance, that the averments of the bill disclosed an adequate remedy at law, and presented no such case as entitled the plaintiff to the relief prayed for.

On December 17, 1886, the court, STOWE, P. J., overruled the demurrer except as to ground assigned against the fifth prayer, wherein the demurrer was sustained.[6]

On February 12, 1887, the defendant, A. A. Hutchinson, filed an answer, which in its material parts and so far as the averments of the bill were not admitted, set forth in substance:

That defendant was induced to enter into the contract of October 11, 1883, by the assurance of the plaintiff that not over $50,000 capital would be needed, and the remainder would be provided from the sales of bonds and stock as the work progressed.

That the object of requiring an assignment of the bonds and stock to the defendant was to enable him, if necessary, to sell them or use them as collateral, as was done, with the plaintiff's knowledge and consent, and also to enable the defendant to look directly to the bridge company.

That the defendant's trip to California was with the knowledge and consent of plaintiff, who urged him to remain, saying he was not needed at home; that defendant advanced all the money and credit needed or requested, and the plaintiff never advanced or raised, unless upon defendant's bonds or stock, any money whatever that went into said bridge; that before any of the bonds or stock, transferred to the defendant through the plaintiff, were sold, defendant had advanced the sum of $80,000; that before leaving for California he provided for the estimates due in August and September, 1884, with Robinson Brothers, and that the bonds and as much stock as possible be sold, with the consent of the plaintiff, who in defendant's absence was directed to attend to these matters and agreed to do so; that defendant by his agent offered to furnish whatever additional money was necessary and also to return, whereupon plaintiff notified defendant that no more funds were needed; and that the contract of October 11, 1883, did not require, nor was it ever the intention or agreement of plaintiff and defend-

ant to wait until said bridge was completed before selling said bonds and stock.

The cause having been put at issue, on February 14, 1887, *Mr. M. W. Woodward* was appointed master and examiner, the material portions of whose report, filed on September 24, 1887, were as follows:

The most important of the plaintiff's claim in this suit is, that the defendant, Hutchinson, never lived up to the spirit or terms of his said contract with the plaintiff; that so far as he acted under the contract, he only effected a partial and deficient, as distinguished from a substantial but defective performance; and that finally he wholly discontinued performance in any degree, and practically abandoned his contract; and that the contract being in character, an entire contract, the plaintiff had the right to treat it as dissolved, and to hold said Hutchinson as having forfeited and abandoned all right and interest in its consideration; especially beyond so much received by him as was necessary to the repayment of his actual outlay.

Mr. Hutchinson meets all this by denial, and the assertion of adequate and substantial performance.

In support of his position the plaintiff undertakes to maintain:

1. That in construing their contract relations, is to be considered the very great consideration given for Hutchinson's undertaking.

2. That this consideration was not only to procure the capital necessary to carry on the construction until the bonds and stock would have value and obtain credit, but primarily to secure the plaintiff from care, anxiety and trouble respecting a ready and adequate supply at all times of the means for meeting estimates and promoting the work, and thereby also relieving him from an unnecessary absorption of his time by that particular enterprise; and, secondarily, to enable the bonds and stock to be retained until the completion of the bridge, when they would have necessarily a greater market value.

3. That although Hutchinson did pay, or cause to be paid, all monthly estimates until that of August, 1884, he was in default in never making payment in time, and thereby causing the plaintiff to be importuned for money, and disappointing

him in respect to the primary object of his contract with Hutchinson.

4. That on July 28, 1884, said Hutchinson having advanced $60,000, under the contract received $75,000 of the bridge bonds to be used as collateral for raising money for the bridge, but appropriated the same to his individual use, and on July 29, 1884, left upon a trip for three or four months to California, without any provisions made, at least so far as known to the plaintiff or Lindenthal, their contractor, for any credit or means for any estimates thereafter to fall due.

5. That at this time the entire undertaking was in peril, and this withdrawal of the presence, credit and means of Hutchinson, placed upon the plaintiff the entire care and burden of raising the funds, then about being needed in greatly increased amounts, and forced him, at once, to arrange for the sale of all the bonds, by which a loss was sustained, and the spirit and purpose of his contract with Hutchinson was disappointed in respect to the said bonds.

6. That after Hutchinson left here upon his said trip, excepting his payment of the estimate for July, he ceased all participation in and all acts of performance under their contract.

   &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

The evidence referred to shows that without any very particular effort to find out what Hutchinson might have done, and without the slightest attempt, by personal inquiry before he left, or by letter, telegram or otherwise, to find out his intention, or to ascertain what he might, could or would do, Mr. McDowell assumed that he could not be relied on, from the somewhat dilatory and unsatisfactory character of Hutchinson's performances and from the then present condition of their affairs, and at once upon his departure proceeded to make arrangements to sell bonds and preferred stock, and within about half a month the bonds were selling readily at par and accrued interest, notwithstanding the unfavorable conditions. And when their sale was established, we hear of no steps to save any of them by any effort to borrow money on them, or by notice to Hutchinson of the changed circumstances.

Without going into the evidence of the original understanding, it seems to us plain from the circumstances noted, that McDowell himself gave an interpretation of the contract which

he cannot contradict. The contract is capable of such construction, especially when both parties have acceded to it in carrying it out. But had McDowell stood up then for his present construction of it, we think his position would have been maintained, and in such case it might have even been doubtful whether the bonds and stock could have been tied up by hypothecation.

Under all the evidence, the arrangement between McDowell and Hutchinson would seem to have been that the latter was to furnish so much capital, estimated from $50,000 to $100,000, to bring up the construction to a point where the balance of the cost could be derived from, or by the use of the bonds and stock. This was practically done, as the sale of the bonds at par was assumed before Hutchinson paid the July estimate of $17,004.15, the sum of $30,000 cash being in hand when he gave his last check of $8,004.15 on that estimate.

That Hutchinson appropriated the $75,000 bonds given him July 28, 1884, in violation of the contract, rests, so far as we can see, upon his action after the bridge was completed. So far as they were needed when he received them, he used them as collateral to borrow money for the bridge ; part were afterwards sold and part retained, and no demands were made for them or for money or credit, as heretofore appears, and none could be demanded so long as there were means in hand from bonds and stock already sold. They and their proceeds are to be accounted for under the contract.

Hutchinson was entitled to receive all the bonds and stock on demand, but all parties participated in treating their singularly meagre contracts with great liberality, and the bridge company, without a line from Hutchinson, delivered bonds and stock to McDowell. It must be inferred that Hutchinson, beyond such means as he did furnish, regarded this use of the entire amount of bonds and stock at McDowell's discretion, as ready and properly to be used or disposed of consistent with the terms of their contract as understood by them, the moment they were available. So that the only practical effect of his absence or of anything he then did or left undone, so far as can be very certainly assumed, is, beyond the worry and exertions McDowell testifies to, that instead of paying the July estimate of $17,004.15 out of the means in his own hands, he

would have acquired it out of the money in Robinson Brothers' hands. And if it is assumed that the particular arrangement with Robinson Brothers might not have been made, it cannot be doubted that a month later, when the next estimate became due (which is the first one not paid by Hutchinson) the advanced construction would have certainly made the bonds available at full value, either for sale or by hypothecation.

As to the point respecting the care, anxiety, etc., thrown upon McDowell, it is too indefinite and unsubstantial a matter to need separate consideration.

It seems to us, therefore, that the grounds relied upon to establish a partial and deficient performance or an abandonment of his contract by Hutchinson, are too feeble and intangible to possibly justify such conclusions, and to be entirely overcome by the weight of evidence in the case.

We have shown above that McDowell cannot maintain the position, that by reason of defaults by Hutchinson, under his contract obligations, there was a sacrifice of the bonds by their premature sale, which Hutchinson alone should bear. That eliminates from their account, the second in importance of the plaintiff's claims.

The other matters of dispute involved in this settlement of this joint undertaking of McDowell and Hutchinson in building the North Side Bridge, are items of expense, paid and incurred by McDowell, and to which Hutchinson has formally objected. Some of these items are of large amounts, and it is not disputed that all of the larger items were of great importance and value to the bridge, and therefore to Hutchinson and McDowell as owners of a very greatly preponderating interest in the company.

Hutchinson still holds some of the bonds, and he and Mr. McDowell held, and yet hold, as far as appears, most of the $200,000 of preferred stock worth par, and the $200,000 of common stock, leaving but $100,000 of common stock worth about $20,000; while the stock received by McDowell and Hutchinson is worth $250,000, making their interest about eleven twelfths in the stock value of the bridge.

Considering this, with the fact fully appearing that in this partnership undertaking McDowell was exclusively in charge of its execution, Hutchinson to furnish to him the money and

credit therefor, and with the fact also fully appearing that there was no attempt by either party to insist on or follow strictly the terms of their agreement, and it would seem right to hold Hutchinson bound by a reasonably liberal exercise of judgment and discretion respecting all matters pertaining to their common enterprise, and affecting directly their mutual interests therein.

At the same time we are bound to keep in mind that the contract for the building of the bridge, primarily fixed the limits of their undertaking, and any work and liabilities essentially outside of that, the bridge company, as such, was responsible for and not a part of its stock held by these parties, however large their proportion.

It is also true that this controversy is only between McDowell and Hutchinson; and, in view of all the circumstances, a very slight acquiescence on Hutchinson's part would shut him out from objecting, at this day, to any of the items under consideration.

With these remarks to show the guiding principles of our judgment on the far most difficult questions of fact in the case, and enable our errors to be more readily understood and corrected, we now proceed to consider each item:

\* \* \* \* \* \* \* \*

Then there is one other matter affecting a settlement of accounts here. The raising of the bridge above its contracted height, by the order of court, entailed a direct additional cost of the bridge of $3,652, and increased land damage by raising and lengthening the approaches, of between $5,000 and $10,000, and this, the plaintiff claims should be added to the $290,000 limit of cost guaranteed to Hutchinson under their contract, the guarantee being expressly respecting this contract with the bridge company and the plans and specifications made part thereof. This claim has not been specifically challenged, and we assume that upon its just and equitable character it is to be admitted.

Another question upon which evidence was taken, was whether before January 7, 1886, all the preferred stock had been issued by the bridge company to McDowell. The president and secretary of the bridge company, with the company books, proved absolutely that it had been fully issued before

Master's Report.

that date. The bill seems to allege that the 2293 shares sued for by Hutchinson, were held by the company as a stakeholder, although not directly and affirmatively charging that such was the fact; and the fact, as it is, was put in evidence without objection. Hutchinson shows clearly a want of knowledge, and a doubt of the fact, even to the time the evidence was put in, and under the contract he was, but for that fact, or that he had forfeited his rights under his contract with McDowell, entitled to the stock on demand, and to bring suit upon its refusal as he did do.

### FINDINGS OF FACT.

1. That Hutchinson did substantially comply with his contract of October 11, 1887, as mutually construed by himself and McDowell in its execution.[7]

2. That the sale of the bridge bonds by McDowell, was not, at the time of their negotiations for sales, of such extreme apparent necessity, as to throw the loss thereby suffered upon Hutchinson.[8]

3. The sale of said bonds was effected without any demands upon or notice to Hutchinson, which the circumstances fairly and reasonably required, if he was to be charged with any responsibility therefor.[9]

4. The plaintiff was charged with the entire duty, authority and responsibility of carrying out the undertaking of himself and Hutchinson for constructing the North Side Bridge.

5. That in executing said undertaking, including the payments of expenses, etc., objected to, McDowell acted in the spirit of good faith towards all concerned.

6. That prior to January 7, 1886, the entire stock due under the contract of March 12, 1883, had been, by the previous consent of Hutchinson, delivered to the plaintiff; but that when the suit No. 406 March Term 1886 was brought, Hutchinson believed that the bridge company still held some amount of the shares of preferred stock.

7. That all deliveries of stock and bonds to Hutchinson were made without anything being done or said which could affect the character of the delivery.

8. That the items of payments and liability presented by the plaintiff, and objected to, were, so far as heretofore approved, porperly paid.

9. That the $75,000 of bonds received by Hutchinson, and the proceeds of the $66,500 of those bonds disposed of, and all stock received by either party, not appropriated by a division made or consent thereto given, and the $7,500 of coupons held by McDowell [paid off by him, while the bridge company was not yet in shape for payment], and all the items allowed of disputed payments, and the unsettled liabilities, and all the advancements and payments made by either party, and heretofore mentioned or discussed, are elements necessary to any final adjustment and settlement between these parties, of their several rights and liabilities arising under their said contracts and the carrying out of the same so far as executed.

Upon our findings we would state the condition of account between these parties as follows:

| | | | |
|---|---|---|---|
| Paid out by Hutchinson | . | . | . | $ 80,478 09 |
| " " Robinson Brothers | . | . | 200,445 49 |
| " " McDowell | . | . | . | 16,019 71 |
| | | | $296,943 29 |
| Items disallowed as above | . | . | . | 1,622 68 |
| | | | $295,320 61 |

In this balance is included the $7,500 and $2,718.50 commissions paid for sale of stock and bonds, and the $3,652 extra cost of the bridge, with the increased land damages of from $5.000 to $10,000 and which we shall place at the lowest amount and thus make the increased cost of raising the bridge $8,652. These sums being for joint liabilities beyond the $290,000 guaranteed limit, would (leaving out the unadjusted liabilities) make the amount received over and above $295,320.61, the true amount to be divided.

But, as it appears that there are unadjusted liabilities, estimated at over $24,000 which are clearly to be finally added as proper charges to the cost of the bridge, we will ascertain their effect upon the account. To do so, we should first deduct the said $7,500, $2,718.50 and $8,652 from $295,320.61, leaving $276,450.11, and, deducting that sum from $290,000, shows the limit of amount of the unadjusted liabilities, to wit: $13,549.89, which can go into the general account. Any balance above that necessarily falls on McDowell.

Assuming those liabilities at that limit, or less, and added to said sum of $276,450.11, then there must be also added this said $7,500.00, $2,718.58, and $8,652.00, which are extra to the limit. So that placing said liabilities as $13,549.89, or beyond, then the $290,800.00 is made full to the guarantee amount, and the $7,500.00, the $2,718.50, and the $8,652.00 added, raises the point for division of profits, to $308,870.50, which sum would be lowered just as much as the said liabilities prove to be under said sum of $13,549.89.

| | | |
|---|---:|---:|
| Hutchinson paid out . . .- . . | $80,478 | 09 |
| Interest to January 1, 1885 . . . | 2,930 | 14 |
| | $83.408 | 23 |
| He received | | |
| Interest on bonds Jan. 1, 1885 $ 2,250 00 | | |
| Cash on bonds sold . . . 47,500 00 | $49,750 | 00 |
| | $33,658 | 23 |
| Difference in interest between bonds held and balance unpaid to February 25, 1886 . . | 425 | 27 |
| | $34,083 | 50 |
| Nine bonds sold February 25, 1886 . . | 9,850 | 00 |
| | $24,133 | 50 |
| Difference of interest to June 26, 1886 . | 112 | 67 |
| | $24,246 | 17 |
| Sale of bonds, June 20, 1886 . . . . . | 11,175 | 00 |
| Balance unpaid . . . . . | $13.071 | 17 |

The bonds on hand, $8,500.00, were then worth $112.00, and, treating his own appropriation as then allowed, he would be charged $9,520.00, reducing his balance to $3,551.17.

| | | |
|---|---:|---:|
| McDowell advanced for Hutchinson, $16,019.71 of which $518.40 is disallowed, leaving due him, | $15,501 | 31 |
| He received the proceeds of 850 shares of stock, the sale of which below par was made before the contract of October 11, 1883, and agreed to by Hutchinson . . . . . | $34,400 | 00 |
| | $18,898 | 69 |

Master's Report.

The common stock was equally divided, and the balance of the bonds held by Hutchinson is treated as appropriated, and we shall treat the unsold preferred stock and coupons on hand as the undivided means for adjusting the balances.

Robinson Brothers sold 537 shares of preferred stock, the proceeds of which went into the bridge, and that with said 850 shares sold by McDowell, leaves 2,623 shares for settlement and division.

|  |  |  |
|---|---|---|
| The preferred stock, at par, 2,623 shares, amounts to   .   .   .   .   . | $131,150 | 00 |
| Hutchinson must receive, to equalize himself with McDowell, said $3,551.17 and 18,898.69 | 22,449 | 86 |
|  | $108,700 | 14 |
| Each is entitled to one half   .   .   . | 54,350 | 07 |
| Hutchinson holds 1,050 amounting to   .   . | 52,500 | 00 |
|  | $ 1,850 | 07 |
| Adding the   .   .   .   .   .   . | 22,449 | 86 |
| Due Hutchinson in preferred stock, 486 shares less 7 cents.   .   .   .   . | $24,299 | 93 |
| He must receive one half the $7,500 of coupons which not counting interest is   .   . | 3,750 | 00 |
|  | $28,049 | 93 |

McDowell holds the stock and coupons due as aforesaid to Hutchinson.

And this adjustment leaves Hutchinson and McDowell equally liable, as above shown, for the unadjusted liabilities to the amount of $13,549.89.

### THE LAW OF THE CASE.

The counsel for the defendant, Hutchinson, maintains that the plaintiff has not made out a case supporting jurisdiction in equity.

They claim that the only ground of jurisdiction is that of account, which is not only one sided, but is all on the plaintiff's side, and that there is adequate remedy at law.

### Master's Report.

We have stated our eighth [ninth?] paragraph of "finding of facts" directly in view of the question of jurisdiction.

For, whether the question of adequate remedy at law is raised respecting an account or anything else, the principle upon which a decision must rest is so clearly and fully established, that it is merely a question of fact, whether the legal remedy, if there is one, is plain, adequate and complete within the sense of the rule.

Story's Eq. Jur. 23, § 33, lays down the rule thus: "The remedy at law must be plain, for if it be doubtful and obscure at law, equity will assert a jurisdiction. It must be adequate, for if at law it fall short of what the party is entitled to, that founds a jurisdiction in equity. And it must be complete, that is, it must attain the full end and justice of the case, it must reach the whole mischief and secure the whole right of the party in a perfect manner, at the present time, and in the future, otherwise equity will interfere."

The rule is construed in a broad and practical sense, and the equity jurisdiction sustained on the ground of a more convenient, efficient or prompt means of reaching the ends of justice.

It is under this rule that Brush Electric Co.'s App., 114 Pa. 574, is decided. Our decisions relating to accounts refer to them as mutual, mixed or complicated, as tests of the question of jurisdiction: Christy's App., 92 Pa. 157. And what is meant by that is merely, that when the account is of such character that it comes within the sense of the rule stated, then equity has jurisdiction, and not otherwise.

It seems to us, in looking at the elements of account and settlement in dispute, as they now appear in the quasi partnership transactions of these parties, that it would be impossible to have them duly tried and disposed of by an action at law, and that under the rule stated, this case, so far as it is for a settlement of business and accounts between these parties, could be much more advantageously, for both parties, disposed of by a court of equity than by a court of law.

Nor is the accounting of this case—speaking literally—all on one side; and, if the most just and equitable settlement is to be reached under the terms of the contract of October 11, 1883, there should be a division declared of stock and coupons

if not of bonds on hand, which to do is peculiarly within the power of a court of equity.

It is clear that an appropriate bill by Hutchinson against McDowell would be sustained. But it is not quite so simple a matter to satisfactorily decide the present case as one merely for account. The bill is drawn mainly upon a theory, and for an object, which under the proofs cannot be supported. Its general frame does not embrace the plan of an adjustment and settlement of the joint claims and mutual accounts of Hutchinson and McDowell upon the basis approved here, and neither by averment nor specific prayer does it so lay the ground as to relieve us, in that respect, of some difficulty and doubt in reaching a decision upon the question under consideration. The bill does not aver anything respecting the difficulties, complications or disputes connected with the plaintiff's accounts, of which so much appears in the evidence. And the stock which the bill treats as in the hands of the North Side Bridge Company, as a stakeholder, is in fact, so far as not sold and the proceeds in McDowell's hands, all held by him.

But the bill does aver Hutchinson's advancements, the stock and bonds he received and that he wrongfully appropriated and never accounted for the proceeds of $75,000 of bonds received by him, and the need of an accounting between him and the plaintiff, and specifically prays that Hutchinson " accounts for the bonds received by him or their proceeds."

The rest of said prayer is of a character to enforce which, necessitated a full accounting between the parties, and the prayer, taken together with the averments of the bill, will perhaps authorize the full relief sought to be obtained under the general prayer : Passyunk B. Ass.'s App., 83 Pa. 441.

Hutchinson had complete power over the bonds and stock in his hands, having the power of collecting interest and dividends and making sale, and, being common property until a settlement and division is reached, he must render his account. And if under the " frame of the bill" some discovery is needed, and the proof sustains it, there at least appears grounds for sustaining the jurisdiction : Bank of U. S. v. Biddle, 2 Pars. 54.

The frame of the bill seems to us to show that as to the bonds and their proceeds, at least, discovery was needed from Hutchinson, and the evidence undoubtedly established the fact.

Master's Report.

We have seen no case like this, where a party, holding in his own hand a certain and large balance, has filed a bill against the other party for an account, unless it were a case of partnership settlement. We take it, however, that the equity rests upon the right to have a settlement and adjustment of mutual and disputed accounts. And this case is practically one of partnership, and deals in part with specific property, the proceeds of a joint undertaking, which, by contract, is the subject of account, settlement and division, until which the possession, unless parted with under the authority of the contract, gives neither party separate property in any part. And the contending parties here have assumed to regard their relations as not that of partners, and so far we have followed substantially the same path and much of the awkwardness, and no little of the difficulties met with result from or are affected by this method of treatment. Our judgment is that said party should be regarded as partners, and this proceeding as for a settlement of the partnership accounts and business between them. The right to equitable relief required becomes clearer in this aspect of the case, and it is manifest that relief is needed, and that it can only be reached, if at all, by a court of equity.

Our opinion is that the jurisdiction can be and ought to be sustained.

The only other questions of law are such as relate to the contract, and performance under it, and insisted on by the plaintiff. As we have discussed the evidence from the standpoint of full acquiescence in all the plaintiff's legal propositions, and only decided against him by compulsion of the facts of the case, there is left no other legal questions requiring consideration here.

If we are in error we think it can only be in not accepting literally the defendant Hutchinson's position, expressed in his testimony and urged upon argument, that he stood now and at all times strictly upon the terms of his contract, because he never did furnish his money and credit beyond $80,478.09. Neither the bonds nor stock became his property by the assignment. His engagement is full, positive and distinct, while the terms respecting the sale of bonds and stocks are not so, and by the character of the whole contract and circumstances of the case, may very well be construed as insisted upon by the plaintiff.

We have, however, interpreted the right and obligations of the parties, and the positions taken by them, in reference to their undisputed course of conduct, accepting that as waiving their rights to any other construction.

Under our conclusions upon the facts there can be no grounds for an injunction, or other equitable relief than that here supported.

Our opinion therefore is, that a decree should be entered in this case, affirming the account between the plaintiff and A. A. Hutchinson as stated in this report, decreeing the division and present delivery of the preferred stock and coupons found due each party, as shown by an account, the same to be and remain a final settlement between them, subject only to their equal liability upon the unadjusted claims as also stated in said statement of account; and that the bill be dismissed as to the North Side Bridge Company, and that the plaintiff and A. A. Hutchinson each pay half the costs.

All of which is respectfully submitted.

To the foregoing report, the plaintiff filed various exceptions, certain of which were that the master erred:

1–3. In his first, second and third findings of fact.[7 to 9]

9. In finding that the defendant was not chargeable with the loss caused by a sacrifice of the bonds.

11. In holding that the $7,500 coupons of the bonds paid by McDowell entitled the plaintiff and defendant to recover the same against the bridge company.

12. In his statement of the accounts as based upon his findings;[11] in not charging all the costs against the defendant, and in his recommendation for a decree.

Said exceptions, together with certain ones filed by the defendant, being overruled by the master, were filed with his report and renewed before the court. After argument, the court, STOWE, P. J., on January 21, 1888, without opinion filed, dismissed all the exceptions and subsequently signed a decree submitted, to the effect that [the report of the master be confirmed absolutely; that the plaintiff forthwith deliver and assign, or cause to be delivered and assigned, to the defendant, 486 shares of the preferred stock of the bridge company and

one half of the coupons of the first mortgage bonds of the bridge company falling due January 1, 1885, being 240 coupons, 90 for $30 each; 50 for $15 each, and 100 for $3 each, found by the master to belong to defendant and to be in the possession or control of the plaintiff;]² upon the defendant giving his bond in $10,000, to be approved by the court, conditioned for the payment by him of the one half of the unadjusted claims stated by the master to be $13,549.89, when said claims shall have been adjudicated and become due and payable; that the account decreed by the master be and remain a final settlement between plaintiff and defendant, subject only to their equal liability upon said unadjusted claims: [That the bill be dismissed as to the bridge company,]³ and [that the plaintiff and defendant, Hutchinson, each pay one half the costs of the proceeding including the master's fee.]⁴

Thereupon the plaintiff took this appeal specifying that the court erred inter alia:

2–4. In the portions of the foregoing decree in [ ] ² to ⁴

6. In sustaining the demurrer of the defendant to the fifth prayer of the bill.⁶

7–9. In sustaining the master's findings of fact.⁷ to ⁹

11. In sustaining the account of the master upon his findings of fact as stated.¹¹

12. In overruling the plaintiff's exceptions to the master's report, particularizing them.

*Mr. S. Schoyer, Jr.*, (with him *Mr. S. B. Schoyer*), for the appellant:

1. The contract of October 11, 1883, was an entire contract. To entitle the defendant to the consideration, he must show either that the contract has been strictly performed on his part, or so substantially performed that the deficiencies in performance can be compensated in money. When the consideration of a contract is single and entire, the contract is entire, no matter how many items are embraced in its subject; and the consideration to be paid, not the thing to be performed, determines the nature of the contract: Lucesco Oil Co. v. Brewer, 66 Pa. 351; 2 Parsons, Contracts, 29–31; McClurg v. Price, 59 Pa. 420; Hartupee v. Pittsburgh, 97 Pa. 107; Quigley v. DeHaas, 82 Pa. 267.

2. The contract being entire, there can be no recovery on an express contract, where the agreement has not been fully performed: McClurg v. Price, 59 Pa. 420; Quigley v. DeHaas, 82 Pa. 267; Martin v. Schoenberger, 8 W. & S. 367; Hartley v. Decker, 89 Pa. 470. But where there has been a substantial performance of an entire contract, the plaintiff can recover in indebitatus assumpsit and use the special agreement as evidence, to recover the contract price, with deduction for slight defects; the law implying a promise to pay the contract price where the defects are slight and can be compensated in damages: Harris v. Ligget, 1 W. & S. 301. Yet, such substantial performance as will warrant this recovery is where every part of the contract is actually performed, but with defects in the time and manner of doing the work which can be compensated in damages and are not of the essence: Ligget v. Smith, 3 W. 331.

3. So, in those cases where there has been but part performance of an entire contract, and defendant has taken the goods or consideration and used it, the law will imply a new contract to pay the actual value of the thing used: Noble v. James, 2 Gr. 278. But where a large part of the work remains undone, so as to disappoint the expectations and motives which led to the contract, this is a complete answer to the action: Stoddart v. Smith, 5 Binn. 355, holding that where part of the consideration fails, and that part is so essential that the contract would not have been made without it, the whole contract is dissolved. And see Dickey v. Schreider, 3 S. & R. 413.

The argument of counsel upon the evidence is not briefed.

*Mr. Geo. B. Gordon* (with him *Mr. John Dalzell, Mr. Wm. Scott* and *Mr. Isaac S. Van Voorhis*), for the appellee:

The findings of the master on the questions of fact, confirmed by the court below, will be reversed only for clear error. "Nothing but very clear error will justify an appellate court in setting aside a master's finding of fact:" Burton's App., 93 Pa. 214; Kisor's App., 62 Pa. 428.

1. The cases cited by the learned counsel for the plaintiff are not pertinent to the issue. And as to the demurrer, we have only this to say: We thought the plaintiff had an adequate remedy at law, but we are content not to insist on it

here.   Yet "proceedings at law will not be enjoined, where the party can have full relief in the principal suit, without resort to equity:" Olmstead's App., 86 Pa. 287; Vanarsdalen v. Whitaker, 10 Phila. 153.   The bridge company could easily have been protected in the suit against it by Hutchinson, by an application to have McDowell interplead as co-plaintiff.

2. Where neither party has insisted on a strict performance of a continuing contract, it is not competent for one of them to rescind, without notice of an intention to insist on a literal compliance: Forsyth v. Oil Co., 53 Pa. 168.   Moreover, a contract under seal will not be set aside by a court of equity, in the absence of fraud, mistake, or turpitude of consideration, nor upon the ground of partial failure of consideration capable of being compensated in damages.   The remedy is at law: Yard v. Patton, 13 Pa. 278.

The argument of counsel upon the evidence is not briefed.

OPINION, MR. JUSTICE HAND:

The plaintiff brought his bill in equity praying for the rescinding of a contract entered into between himself and Hutchinson, one of the defendants; for an account; for the refunding of expenses incurred by reason of defendant's default; to restrain the delivery of further stock by the bridge company to Hutchinson; and to stay proceedings at law instituted by Hutchinson against the bridge company, which were wholly dependent for validity on a settlement between the plaintiff and Hutchinson.   The bridge company was made defendant in the bill.

The facts are as follows : On March 12, 1883, the plaintiff entered into a contract with the North Side Bridge Company to construct their bridge over the Allegheny river for the consideration of $250,000 of their corporate 6 per cent bonds, $200,000 of their preferred stock and $200,000 of their common stock.   On October 11, 1883, defendant Hutchinson, party of the first part, entered into a contract with plaintiff reciting the above stated agreement, by which Hutchinson agreed "to advance from time to time whatever money is needed to carry on the work of construction of said bridge, or loan his credit to party of the second part to enable him to obtain the necessary funds . . . . , and in a total amount not to exceed the

sum of $270,000 for the entire completed bridge, franchises, land and other damages, and the purchase of real estate."

The said McDowell "before any money or credit shall be advanced (agreed) to transfer to said Hutchinson his entire right to receive from said bridge company" the bonds and stocks before mentioned. "All money realized from sale of bonds and stock (to) be first paid to party of the first part until he received back the money and interest advanced."

"Whatever stock or bonds or the proceeds thereof shall be left over and above the cost of the said bridge . . . . . shall be divided equally between said parties, and McDowell guarantees that the total cost of the bridge etc. shall not exceed the sum of $290,000," any excess to be paid by him. No bond was to be sold for "less than ninety per centum without the consent of McDowell unless it appear that such price cannot be obtained, and in such an event they shall be sold under direction of some reputable banker for whatever price he can obtain for them."

On the same day, October 11, 1883, McDowell assigned to Hutchinson his right to the bonds and stock to be issued according to his contract with the bridge company, which assignment the bridge company agreed to and approved December 10, 1883.

In the agreement between the parties of October 11, 1883, contracts let by McDowell were to be submitted to Hutchinson for approval. The largest contract was let to one Lindenthal and was for "the foundation, stone work, piers, approaches and superstructure of the bridge." Payments were to be made thereon monthly as the work progressed, on the 15th of each month. This contract was signed by Hutchinson with McDowell, so that Hutchinson knew when the money or credit was to be furnished by him.

Hutchinson advanced $80,478.09 up to and including the July estimate. After this he furnished no money nor credit. He was amply able to furnish the whole amount needed up to the $270,000. After the above advances McDowell procured and delivered to him $75,000 of the bonds of the company. Soon after this Hutchinson went to California upon a wedding trip. His intended absence was known to McDowell. Hutchinson made no provision for paying the estimates in his

absence, according to his contract. McDowell did not know of this until the money was needed and on application at Hutchinson's office could not be procured. There was an attempt to show that Hutchinson had made arrangements for the money but it was not proved that they were actually made. It amounted to mere conversations with other parties, and, if it was made, he neither notified McDowell of it nor had the money or credit ready to be furnished. The estimates falling due in Hutchinson's absence were not paid, and none were paid or provided for by Hutchinson after that.

Under the circumstances, McDowell was compelled, in order to carry on the work of the bridge and provide the proper financial support beyond chance of failure, to negotiate all the bonds of the company and some of the preferred stock.

The facts connected with this are contained in paragraph eight of plaintiff's bill which the master has practically found to be true. It is as follows:

"Your orator further says that after the departure of the said Hutchinson for California, your orator entered into an arrangement with the firm of Robinson Brothers, brokers, a firm of high standing in the city of Pittsburgh, looking to negotiation of a sufficient amount of the bonds and preferred stock of the company to enable your said orator to complete the said bridge, and those arrangements were so proceeded with that after a full investigation of the validity of the said securities, the said Robinson Brothers agreed to procure discounts of the same upon the condition that the money derived from the sale thereof should be held by them in a separate account and disbursed only upon the estimates of the engineer in charge of the construction of the said bridge, to protect the purchasers of the said bonds and stock; and it was only through the high standing of the said firm, and the influence which their representations secured under such arrangement that the bonds and stock were sold by them; that said firm did succeed in negotiating the said bonds and a sufficient amount of the preferred stock to meet the requirements of the contractors of the said bridge up to the present time, although the said bridge is not yet completed, but that the said negotiations were conducted at a sacrifice to your orator, which he was by no means bound to sustain, by reason of the discount

which the bonds and stock necessarily were compelled to submit to, from the fact that they were hypothecated upon a bridge in process of completion which the inclemency of the season might at any time destroy; and that had the said Hutchinson complied with his contract and the bonds retained until the completion of the bridge, the said bonds would have commanded a premium and the preferred stock would have commanded par, thus saving to your orator a large amount of money which he has been compelled to lose."

This paragraph is fully sustained by the evidence in the case.

The amount of loss sustained by reason of Hutchinson's failure to advance the required money or credit was shown to be $30,000, or 12 per cent on the bonds. The cost of the bridge was necessarily increased by legal proceedings instituted which compelled the raising of the bridge. This and other matters found by the master increased the proper cost of the bridge as between these parties to $308,870.50 of which an item of $13,549.89 is estimated which may be reduced eventually. Some receipts of stock besides the bonds heretofore mentioned were proved in the hands of Hutchinson which will be referred to when we come to re-state the account.

We have examined the evidence with great care, and, while we differ from some of the inferences of the learned master which he has denominated as findings of fact, we are enabled to find all the essential facts within his report which should determine the equities in this case, and his report has therefore been of great service to us. Where, as in this case, a large number of facts are found to be proved and inferences are drawn therefrom as facts themselves, it is essential in a review of the case to note the distinction between a proved fact and an inference. We think this accounts for the way in which, as we view the case, the court below were misled. An examination of the findings of fact by the master will show that the first three are inferences, proper enough from the standpoint of the master, but wholly misleading if the court erroneously and unconsciously adopts them as actual facts. We shall not criticise the report of the master specifically in all points where we differ, except so far as our conclusions themselves modify it.

The facts above stated are beyond dispute. The evidence

in its totality, fairly considered, shows that to the utmost requirement McDowell lived up to the letter and spirit of his contract with Hutchinson; that Hutchinson performed only a part of the covenant which was exclusively his duty to perform; and the only cause for not realizing the fullest expectations and legitimate success of the contract and the enterprise, was due to Hutchinson's default and failure to perform. That this is a proper conclusion of fact as well as law, will further appear. The master makes the inference himself and no other could be adopted.

The law governing this case is that which the parties have themselves made in their written contracts. They are unambiguous and clear. Let us look at the contract of October 11, 1883. Hutchinson bound himself " to advance from time to time whatever money is needed to carry on the work of construction of said bridge or loan his credit to party of second part to enable him to obtain the necessary funds in a total amount not to exceed the sum of $270,000." That which was " necessary," was money or credit of Hutchinson sufficient for the entire completed bridge, franchises, land and other damages and purchase of real estate. It was stated in the preamble that this money or credit was necessary to enable McDowell to carry out his said contract with the Bridge Co. to completion.

McDowell on his part was already bound to complete the bridge, but it was reiterated that the burden was upon him to furnish a bridge completed in every respect, and that he would do it so far as Hutchinson was concerned out of the $270,000 that he was to furnish, and guarantee that the whole cost would not exceed $290,000, or, if it did, it was expressly agreed that McDowell was to pay the surplus and it was not to come out of Hutchinson's share of the bonds or stock. McDowell was to transfer his right to receive the entire bonds and stock. He did transfer it at once.

Is there any ambiguity about the terms of this contract? Certainly not. It is not the case of an ordinary partnership in which both parties may be called upon to do all that the partnership contemplates, and in which the act of one is the act of both as between themselves. Specific acts are here fixed for each party, and the specific act of one is the consideration

of the specific act of the other. McDowell is not to do Hutchinson's duty, nor Hutchinson McDowell's, and the whole success of the bridge and of the enterprise, as a business venture, depended upon each one actively and constantly doing his own peculiar duty. Hutchinson's duty was just as essential to support the enterprise, as the foundation stone to be laid by McDowell was essential to support the bridge. It required no notice from either party to create an obligation if he failed to perform; it might be safe to give such notice, but it was not necessary. McDowell had the right to assume that Hutchinson would keep his contract when he left for California.

Again; what was the status of the bonds and the stock? They were the consideration of McDowell's work and materials. They were his property. Hutchinson loaned or was to loan the money or his credit to McDowell. In the latter case McDowell was to procure the money. It is not pretended that the transfer of bonds and stock to Hutchinson was a sale of them. So far as he and McDowell were concerned they were in Hutchinson's hands to secure the performance of the contract, and that was, that when the full amount was advanced and the bridge completed the advances were to be paid first out of the proceeds, and the residue divided in specific bonds and stock between the parties. It matters little whether we call them collateral securities, or held in trust by Hutchinson; the law and the equities are the same. When a loan like this is provided for and a large amount of securities passed to the lender, the law fixes the character of the holding. The title was still as between McDowell and Hutchinson in McDowell. As regards third parties who purchased, it would be different.

This transaction differs nothing from every absolute transfer of stock as a collateral with a power of sale. It is the loan or advance which is made and to be repaid which gives the character of a pledge to the transfer. It verges upon the point of absurdity to say that before Hutchinson had advanced a dollar of money or credit, the transfer of $650,000 of securities to be received for the bridge was an absolute sale of the securities. It is true, that in his testimony Hutchinson seems to so consider it, but it is contrary to all business transactions and every legal presumption to so treat it. McDowell swears to the contrary in his testimony, and says the understanding

was that the securities were not to be sold. His testimony is corroborated by the legal construction of the contract. Thus much as to the nature of the agreement.

We have seen that in all respects McDowell fulfilled his contract and that after the advance of the $80,478.09 Hutchinson failed in his. This is the turning point of this case : a clear breach of covenant on one side and performance on the other. At this juncture McDowell stepped into the breach and performed Hutchinson's duty. He did it at great loss to himself and to the common enterprise. This he had the right to do, but it changed the equities of the parties under their contract.

At this point we might close this case, settle the equities, re-state the account and allow McDowell the proper damages, but we will consider the equities at length.

McDowell asks us to declare the contract wholly rescinded as of the date of Hutchinson's breach. Can we go to this extent?

A party who keeps his contract under a vital breach of the other party, may do one of two things : rescind the contract, or stand upon the contract and ask for damages for the breach. If he rescinds it, he must do so at once or within a reasonable time. This McDowell did not do. He might have done it. The master correctly states the situation when he says, " Had McDowell stood up then for his present construction of the contract we think his position would have been maintained, and in such case it might have even been doubtful whether the bonds and stock could have been tied up by hypothecation." He did not dissolve the relationship and abrogate the contract. It would probably have involved litigation which it was necessary to avoid. He cannot ask us to do what he did not do for himself. He can however stand on the contract and ask to be reimbursed for his damages by reason of Hutchinson's breach. He did not release his damages.

The master errs in allowing the clear facts of the case to be set aside by his inferences. The rules of evidence will not permit it. We find nothing in this record which amounts to a waiver of his equities in this behalf. It is true he did not show a belligerent spirit nor anticipate trouble until it was necessary, but this is no evidence of a release of his rights. His delivery

of the stock subsequently to Hutchinson, to the extent which he did, and his letter after he had by his loss secured the success of the enterprise, nor the mere talk before the contract that $50,000 might be all the money that would be needed, were no waiver of his rights. Solemn covenants cannot be set aside nor broken contracts released, on such slight testimony. When pressed to a point where if he had yielded he might have compromised his rights, McDowell quietly but persistently refused to comply with Hutchinson's demands, and hence the latter instituted the legal proceedings against the bridge company. When Hutchinson returned from California he did not seek to take up the burden McDowell had assumed. His anxiety alone seems to have been to secure the largest possible fruits of profit to himself without any corresponding fulfilment of duty on his part. In the light of the legal obligations resting on the parties, the conduct of Hutchinson stands in marked contrast to that of McDowell, and as we gather from the report the master himself so views it.

We need not discuss the question whether the covenant of Hutchinson was dependent or independent; it is one in which the breach may be compensated in damages, and it is to be treated exactly as stated by GIBSON, C. J., in Ligget v. Smith, 3 W. 333, as if it was separate and independent. We have a covenant kept in part and broken as to the residue, and the measure of damages is what it cost to fulfil the contract. Hutchinson is to be held responsible for his breach. After his failure to comply, the sale of the bonds by McDowell was such a necessity and reasonable provision to save the enterprise, that it threw the loss thereby suffered wholly upon Hutchinson. It increased the cost to them of the bridge and McDowell should bear no part of it.

The items of account as found by the master are in the main correct. We adopt a simple mode of stating the account and in this differ from the statements presented by counsel for both sides, which contain manifest errors. The mode of settling their accounts is provided for in the contract. It is a division of the bonds and stock on hand as specific articles, a division in kind, not in the first instance in value as dollars and cents. There is no cash on hand "proceeds of bonds or stock" to be divided. In this division, the bonds are out of the ques-

tion because they are sold or appropriated. We make these statements, because a state of things might have existed which would require the cash account and the stock and bond account to be kept separate. Fortunately, for clearness of understanding the account may be all stated as if in dollars and cents, the items showing what is cash and what specific articles of stock.

It is admitted that the preferred stock is worth par and with the bonds and stock received by Hutchinson he has received practically in cash more than sufficient to pay all his advances and interest. In the view we have taken the bonds and stock were all assets in the hands of McDowell to first pay the cost of the bridge which included all the advances by Hutchinson either made or to be made up to $270,000, and such amount as should be added to the $270,000 by operation of law. Under the facts of this case, the loss on bonds, $30,000, as a cash item, is to be added to the cost of the bridge just as the $7,500 was added by the master, as loss on the stock sold by agreement of parties. It is clear that if both parties had kept their agreement and the bonds and stock held and only sold as contemplated to pay the final cost of the bridge, the division in bonds and stock would have been the difference between the gross amount of bonds and stock, and the cost of the bridge. This gives us a sure method of stating the equities between the parties. Equity will hold Hutchinson to the full performance of his duty under his contract, by making him responsible for what he failed to perform. This legal aspect of the case is warranted by the nature of the transaction and the object and design of the parties. Partners may hold each other to such independent covenants, and claim damages for their breach: Wright v. Smyth, 4 W. & S. 533.

The measure of damages is properly stated by GIBSON, C. J., in Ligget v. Smith, cited above, to be what the contract would yield less a sum sufficient to compensate his defective execution of the contract, and it makes no difference whether the covenants are mutual or dependent, or separate and independent. When, as in this case, the part of the covenant not fulfilled must be performed, the same rule of damages is what it costs to fulfil it: Sedgwick on Meas. of Damages, 236, note. In stating the account we shall allow Hutchinson such profit as the contract would have given him less the losses occasioned by his own default.

Another question raised in the case and covered by the sixth assignment of error is with reference to the prayer for an injunction against prosecuting the suit against the bridge company. It is clear that the disposition of this case leaves no equities or legal claims on the part of Hutchinson against the bridge company. Any equity against them must be sought through McDowell. The pendency of that suit is a mere menace to prevent a settlement between the company and McDowell. Why then may not McDowell in equity ask that the proceedings may be enjoined? The cause of action and the proceedings are fully admitted on this record under the bill and answer, and the proofs correspond. It is true McDowell is not a party to that action but he is interested and hence does not come within the case of New York v. Connecticut, 4 Dall. 1–3, cited in the text books. The bridge company accepted notice of and approved of the assignment by McDowell to Hutchinson, and for this reason Hutchinson claims to hold the bridge company. They became in effect sureties for McDowell for the delivery of the bonds and stock to Hutchinson, in case Hutchinson fulfilled his agreement. But Hutchinson did not keep his agreement and by his failure he released the sureties. They join in the prayer of the bill, were made defendants in the bill, as McDowell had the right to make them. The proceedings at law are inconsistent with the decree in this case, and a clause may therefore be inserted in the decree restraining those proceedings: Hilliard on Injunctions, 3d ed., 273. It is also a not uncommon basis of jurisdiction in equity, when the application is to stay proceedings where sureties have been released by a mode of dealing with the principal debtor: Story's Equity Jurisprudence, section 883. The parties are all before us and this plaintiff shows his equity. We think the demurrer should have been wholly overruled instead of partially.

In regard to the item of coupons, $7,500, we consider that a voluntary payment by McDowell so far as Hutchinson is concerned. It is true it was necessary probably to preserve the credit of the bonds, but it involves a question between McDowell and the bridge company which we are not called upon to settle. If it is a claim against the company, McDowell has the coupons to assert it; if not, he has them to return. They

should not be included in this account, either as a cost item of the bridge or as an asset.

In regard to the costs, we are clear under the authorities and upon the facts of this case that McDowell should pay no part of the costs. He has kept his contract to the letter; he succeeds on all the material points which make an issue for sustaining this bill, and the default is wholly on the part of Hutchinson.

In the foregoing review of the case we have sustained the following assignments of error, viz., the second, third, fourth, sixth (as numbered in the paper book), seventh, eighth, ninth, eleventh. It is unnecessary to refer specifically to other assignments of error.

In accordance with the foregoing views we re-state the account as follows, premising that for the purposes of this suit we need take account only of Hutchinson's share in the enterprise, inasmuch as everything outside of that falls upon McDowell for better or worse.

| | | | |
|---|---|---:|---:|
| Total assets of bonds and stocks | . . . | | $650,000 00 |
| Deduct total cost of the bridge as found by the master | . . | $308,870 50 | |
| Deduct coupons included | . . | 7,500 00 | |
| Corrected cost of bridge | . | $301,370 50 | |
| Add loss on sale of bonds | . . | 30,000 00 | 331,370 50 |
| Total profits . . . . . . . | | | $318,629 50 |
| One half to Hutchinson | . . . . | | 159,314 75 |
| Deduct loss occasioned to McDowell by including whole loss as above which makes him pay one half thereof | . . . . | | 15,000 00 |
| Balance of profit to Hutchinson | . . . | | $144,314 75 |

Add balance due Hutchinson on following statement of account for advances, viz.:

| | | | | |
|---|---|---:|---:|---:|
| Total advancements as of Jan'y 1, 1885, | | $83,408 23 | | |
| Bonds received | . . . | $75,000 | | |
| Coupons to January 1, '85 | . | 2,250 | 77,250 00 | |
| January 1, 1885, balance due | . . | $6,158 23 | | |
| Interest to June 26, 1886, | . . | . | 549 80 | $6,708 03 |

Balance due Hutchinson in cash & stock    .    $151,022 78
Amounts received by Hutchinson
    Common stock    .    .    .    $100,000
    Preferred stock .    .    .    .    52,500    $152,500 00

Amount due McDowell by Hutchinson    .    .    $1,477 22

This amount should be refunded in preferred stock, to wit, twenty-nine shares and twenty-seven dollars and twenty-two cents fraction of a share paid in cash, or the value of said shares and fraction, to wit, the sum of fourteen hundred seventy-seven and .22 dollars paid in cash.

The decree of the court below is reversed, except so far as it required the giving of a bond in $10,000 by A. A. Hutchinson to be approved by the court, and the following decree is entered:

Now, to wit, January 7, 1889, it is ordered, adjudged and decreed, that the defendant, A. A. Hutchinson, forthwith deliver and assign or cause to be delivered and assigned to the plaintiff, Nathan M. McDowell, twenty-nine shares of the preferred stock of the North Side Bridge Company of the par value of fifty dollars each and pay to him twenty-seven dollars and twenty-two cents in cash, the fraction of a share, or in default thereof, pay the value of said shares and fraction, to wit, the market value of said shares and fraction thereof at the date of this decree in cash; that the account as above stated be and remain a final settlement between the said plaintiff and the said A. A. Hutchinson subject only to their equal liability upon the unadjusted claims of $13,549.89, as stated in the master's report, and the said A. A. Hutchinson give a bond as required in the decree entered in the court below in this case in the sum of $10,000.00, to be approved by said court if not already given and approved, and if so given and approved, to remain in force for the purpose indicated, viz., conditioned for the payment by said Hutchinson of the one half of the unadjusted claims stated by the master to be $13,549.89; when said claims shall have been adjudicated and become due and payable. And it is further ordered that the said A. A. Hutchinson be perpetually enjoined from further maintaining the suit at No. 406 March Term 1887, instituted by him in the Court

of Common Pleas No. 1 of Allegheny county against The North Side Bridge Company, referred to in the bill filed in this case.

> And it is further ordered that A. A. Hutchinson defendant pay all the costs of the proceedings in this case, including the master's fee of one thousand dollars to be taxed as costs and pay the costs of this appeal, and the record is remitted for the enforcement of this decree by the court below.

After the filing of the foregoing opinion, an application was made by A. A. Hutchinson for the correction of alleged errors in the account stated in the opinion, and for a re-argument, generally, of the cause. On March 11, 1889, the motion for a re-argument was refused, the statement of the account confirmed, and so much of the decree as required the giving of a bond by A. A. Hutchinson to secure the payment of one half of the estimated items making up the sum of $13,549.89, was vacated, but without prejudice to the right of McDowell to proceed for the recovery of one half of any excess over the said sum, to which the said unpaid items may on final settlement amount.

Argued November 1, 1888—Decided January 7, 1889.